**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MINDY MURILLO, as independent administrator of the Estate of THOMAS M. YOUNG, deceased,

        Plaintiff,

        v.

UNITED STATES OF AMERICA,

        Defendant.

No. 17-cv-1279
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Thomas Young (Young) was a veteran who was honorably discharged from the Army following two tours of duty in Iraq. Tragically, Young, several years after returning home, took his own life. Mindy Murillo (Plaintiff), Young's spouse and the Independent Administrator of the Estate of Young, filed this wrongful death action against the United States of America (Defendant) pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. R. 1, Compl.[1] Plaintiff alleges that the Department of Veterans Affairs (the VA) and its employees were negligent by failing to prevent Young's suicide.

Before the Court is Defendant's Motion for Summary Judgment. R. 40, Def.'s MSJ. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

## Background[2]

The following undisputed facts are set forth as favorably to Plaintiff, the non-movant, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the Court assumes the truth of those facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Young entered the Army around January of 2003, when he was 18 years old. R. 44, Pl.'s Resp. DSOF ¶ 2; R. 46, Def.'s Resp. PSOF ¶ 1.[3] He was deployed twice to combat zones in Iraq and was honorably discharged on January 24, 2007. Def.'s Resp. PSOF ¶ 1. In April of 2008, Young obtained anger management counseling at the Hines Veterans Affairs Medical Center (Hines VA). Pl.'s Resp. DSOF ¶ 3. In May of 2008, Young was seen for further evaluation by a mental health professional and was assessed to be a low risk for suicide. *Id.* Following this, Young did not receive any further treatment or care from the Hines VA until July of 2014. *Id.* ¶ 4.

In July of 2014, Young presented at the emergency room of the Hines VA, seeking treatment for alcohol abuse. Pl.'s Resp. DSOF ¶¶ 4–5. He denied having thoughts of harming himself or others at that time. *Id.* Young was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood. Young left the emergency room before full discharge instructions could be given, and he did not show

---

[2]The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b).

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for Defendant's Statement of Facts [R. 42]; "Pl.'s Resp. DSOF" for Plaintiff's Response to Defendant's Statement of Facts [R. 44]; "PSOF" for Plaintiff's Statement of Additional Facts [R. 44]; and "Def.'s Resp. PSOF" for Defendant's Response to Plaintiff's Statement of Additional Facts [R. 46].

up for his follow up appointments on July 7, 2014 and July 16, 2014. *Id.* ¶ 6. On August 11, 2014, the Hines VA made a follow-up call to Young but his number was not working, and the Hines VA staff were unable to reach him. *Id.* ¶ 7. The author of the note for August 11, 2014 stated in the note that the consult for Young would discontinue. *Id.* ¶ 8.

In June of 2015, Young went to the Holy Family Medical Center (Holy Family) for help with his drinking. Pl.'s Resp. DSOF ¶ 9. Holy Family determined that Young needed to go to Lutheran General Hospital (Lutheran General) for a psychiatric admission. *Id.* On June 30, 2015, Young was admitted to Lutheran General for assessment of his alcohol abuse, depression, and suicidal ideation. *Id.* ¶ 10. At Lutheran General, according to Nancy Young, Young's mother, Young reported hearing voices and had nightmares. *Id.* ¶ 9. Young told Nancy Young that he had had thoughts of hurting himself and had been to the railroad tracks. *Id.*

On July 2, 2015, Young was transferred to Lutheran General's psychiatric unit. Pl.'s Resp. DSOF ¶ 11. According to Lutheran General medical records, a prior note indicated that Young had been intoxicated with alcohol and went to lay down on the train tracks waiting for a train to come and kill him. *Id.* Other notes indicated that Young later stated that he was asleep on the tracks and had not wanted to kill himself. *Id.* The medical records also noted that Young had a history of depression, anxiety, cocaine abuse, alcohol abuse, and polysubstance abuse. *Id.* He was transferred to the psychiatric unit after being cleared for outlying medical conditions. *Id.*

A day later, on July 3, 2015, Young left Lutheran General "against medical advice." (AMA) Pl.'s Resp. DSOF ¶ 12. Dr. Levin, a psychiatrist at Lutheran General, treated Young. *Id.* Dr. Levin noted that Young denied any suicidal or homicidal ideations, and had been compliant with treatment. *Id.* He also reported that Young had a follow-up appointment at the Hines VA on July 4, 2015, and that Young had a phone interview with "Gateway" the next day for further treatment. *Id.* Dr. Levin also noted that Young's mother had no safety concerns about his leaving Lutheran General, and that Young's wife, Plaintiff, was also contacted and indicated she preferred Young to be discharged to home. *Id.* Plaintiff denied safety concerns, stating that she could monitor Young as well from home. *Id.* While Dr. Levin thought Young should stay longer in the hospital, he also determined that Young did not meet the criteria for involuntary commitment, and, therefore, discharged Young AMA. *Id.*

On July 9, 2015, at 11:36 a.m., Nancy Young called the Jesse Brown Veterans Affairs Medical Center (Jesse Brown) on Young's behalf. Pl.'s Resp. DSOF ¶ 14; Def.'s Resp. PSOF ¶ 5. Nancy Young placed this call from her home phone. Def.'s Resp. PSOF ¶ 5. After dialing the phone number and handing Young the phone, Nancy Young left the room. Pl.'s Resp. DSOF ¶ 14. Valerie Creedon (Creedon), the Program Manager for the Operation Enduring Freedom / Operation Iraqi Freedom Clinic at Jesse Brown (the OEF/OIF Clinic), answered the phone call. *Id.* The OEF/OIF Clinic provides primary care, mental health care, and social work services. Def.'s Resp. PSOF ¶ 6. It employs two primary care physicians, a psychiatrist, two psychologists, a nurse practitioner, and three social work case managers. *Id.*

4

During this call, Young discussed, among other things, opening a "service connection" with Jesse Brown. Pl.'s Resp. DSOF ¶ 17. "Service connection" refers to a process through which a veteran can seek benefits from the VA relating to a claim for an injury, illness, or condition that is service related. *Id.* ¶ 18. Young also indicated to Creedon that he was seeking help with his drinking and PTSD, and that he had prior negative experiences at the Hines VA. *Id.* ¶ 20. Prior to this call, Young's medical chart with the VA did not indicate a clinical diagnosis of PTSD. *Id.* ¶ 17. The call lasted approximately ten minutes. *Id.* ¶ 20. Creedon testified that if she had concerns about Young taking his life during the call, she would have referred him to the suicide prevention team. *Id.* ¶ 32. Additionally, according to Creedon, if Young wanted urgent mental health services immediately, she would have had him come into Jesse Brown that day. *Id.* Creedon testified that she told Young that Mark Galban (Galban), a social worker in the OEF/OIF Clinic, would call him; gave Galban's direct number to Young; and told Young he could call her back. *Id.* ¶¶ 34, 38. Creedon informed Young that walk-ins were available and that appointments could be made. *Id.* ¶ 34. According to Creedon, Young sounded alert, oriented, and coherent, and had normal cadence in his speech. *Id.* ¶ 35.

Creedon could not document this phone call in the Jesse Brown medical records system because there was no chart for Young in the system at the time of the call, as Young was not a patient at the time. Pl.'s Resp. DSOF ¶ 37. Creedon offered to have Young's records "pulled through" so that Galban could then document his interactions

with Young when Galban called Young back. *Id.* Young would not have to meet with

a case manager such as Galban to set up a service connection. Def.'s Resp. PSOF ¶ 11.

At 11:51 a.m. on the morning of July 9, Creedon sent an email to staff,

instructing her Outreach Enrollment Scheduling team to help bring Young into the

Jesse Brown system. Pl.'s Resp. DSOF ¶ 38; R. 42-10. She assigned Galban as the

case manager to outreach "once [Young] is in the system to assess for Care

Management needs." *Id.*

On the same day, in response to an email from Galban, Creedon stated as

follows: "I told him you would be reaching out to him to set up an appointment so he

would know what you wanted him to bring with when you met (ie for SC). … I think

this may be a guy who would be happy to let us, let him, slip through the cracks,

please don't let that happen. He needs help, thanks." Pl.'s Resp. DSOF ¶ 44; R. 42-

10. Creedon used the phrase "slip through the cracks" because she had a gut feeling,

and experiences with other veterans that they miss appointments or avoid phone calls

from the VA. Pl.'s Resp. DSOF ¶ 44. She further stated that then people fault the VA

when they do not get care, and she wanted to be sure that Young really was "good to

go," as he stated. *Id.*

Later that day, Galban and Creedon met, and during this meeting, Creedon

told Galban that Young needed help with service connection, Young was already

connected with mental health services in the community, and that Young did not

want to come into the VA for treatment. R. 42, DSOF ¶ 45. Galban clarified with

Creedon whether Young had any immediate clinical needs or if the call was non-

clinical. *Id.* ¶ 46. Creedon informed Galban that Young just wanted help with service connection, that he did not want to come in for care, that he already had care established in the community, and that he was on the waiting list for outside alcohol treatment. *Id.*

On July 13, 2015, at 2:06 p.m., a call was placed from Young's home phone number to Jesse Brown that lasted one minute and thirteen seconds. Def.'s Resp. PSOF ¶ 20. The record contains no other information about this call.

The timing for return calls by case managers such as Galban varies depending on many factors. Pl.'s Resp. DSOF ¶ 48. Case managers are required to triage their cases by balancing the reasons for the call against whether the veteran is in crises, the degree of care required, and other veterans' needs. *Id.* Specifically, case managers are required to balance several factors, including case severity/complexity, intensity of each veteran care plan, availability of community-based services, communication and coordination with VA, Department of Defense, and Veterans Benefits Administration resources, case managers' other duties, intensity of support needed by the family, amount of administrative support, benefit provisions, types of interactions with beneficiaries, and a case manager's professional experience and knowledge of the patient population. *Id.* Whether the request for service is clinical versus non-clinical is a primary factor to be considered. *Id.* Clinical requests, such as requests for mental health treatment, are more urgent and are given higher priority than non-clinical requests, such as service connection claims, or property taxes. *Id.*

On July 24, 2015, Galban attempted to contact Young by calling the number Young had provided Creedon, and also the number that Young had called from. Pl.'s Resp. DSOF ¶ 47. Nancy Young answered the phone and informed Galban that Young had taken his life the day before. *Id.* According to Nancy Young, at or about the time of the July 9, 2015 call, she thought Young was deteriorating but she did not know he was suicidal and had no "inkling it was that bad." *Id.* ¶ 52. At no time did Young express further suicidal thoughts after he left Lutheran General on July 3, 2015, and, if he did, Nancy Young would have taken Young back to Lutheran General. *Id.*

Young passed away on July 23, 2015. R. 12, Def.'s Answer ¶ 15. Young's wife, Plaintiff, was then appointed the Independent Administrator of Young's estate. *Id.* ¶¶ 16–17. Plaintiff filed[4] this wrongful death action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. Plaintiff alleges that the VA and its employees were negligent by failing to prevent the suicide of Young, a veteran.

## Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled

---

[4]Plaintiff complied with 28 U.S.C. § 2675 of the Federal Tort Claims Act by serving notice of the claim upon the VA within two years of the incident forming the basis of the suit. Def.'s Answer ¶ 4. After waiting six months from the date of submitting her claim, and after receiving a denial of her claim from the Office of General Counsel for the VA, Plaintiff filed this suit. *Id.* ¶ 5.

to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

Plaintiff seeks to recover damages for Young's death based on the alleged negligence of the VA and its employees under the Federal Tort Claims Act and the Illinois Wrongful Death Act.

The Federal Tort Claims Act "provides a remedy for personal injuries caused by negligent acts of governmental employees acting within the scope of their employment." *Luna v. United States*, 454 F.3d 631, 632 (7th Cir. 2006) (citing 28 U.S.C. § 1346(b)(1)). It is a limited waiver of the federal government's sovereign immunity, and "exposes the United States to liability for personal injuries as a result

of its negligence to the same extent that a private person would be liable under the law of the place where the negligence occurred." *Id*. at 634. All relevant actions in this case occurred in Illinois. Thus, Illinois law governs.

The Illinois Wrongful Death Act states, "[w]henever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof." 740 ILCS 180/1. The Illinois Wrongful Death Act "incorporates into the statutory right of action the familiar concepts of tort liability,—negligence, contributory negligence, and the like." *Ford-Sholebo v. United States*, 980 F. Supp. 2d 917, 980 (N.D. Ill. 2013) (quoting *Williams v. Manchester*, 888 N.E.2d 1, 12 (2008)). Plaintiff's claims are based on the alleged negligence of the VA and its employees. Compl. ¶ 14. "To succeed on a negligence claim in Illinois, a plaintiff 'must allege and prove that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries.'" *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013) (quoting *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (1999)).

Defendant argues that summary judgment is proper because there are no facts in the record from which Plaintiff could prove that the VA or its employees owed a duty to Young or that a breach of any duty was the proximate cause of Young's death. The Court agrees.

## I.  Duty

Defendant first moves for summary judgment on the issue of whether the VA owed a duty to treat Young and prevent his suicide. R. 43, Def.'s Memo. at 8–11. Plaintiff alleges that the VA and its employees were under certain duties imposed by law. Compl. ¶ 13. Plaintiff alleges that the VA and its employees were negligent by: (i) failing to timely return Young's calls; (ii) failing to document the contents of the July 9, 2015 call; (iii) failing to timely offer Young psychiatric evaluation or care; and (iv) improperly training its staff on the handling of calls made by military veterans in need of psychiatric evaluation or care. *Id.* ¶ 14.

Defendant argues that the VA owed no duty to Young beyond a duty to return Young's July 9, 2015 call. Def.'s Memo. at 8. It specifically argues that the VA had no duty to treat Young for his alleged alcohol problem or PTSD because Young was not a patient of Jesse Brown. *Id.* Plaintiff responds that a treatment relationship was established between Young and Jesse Brown, and that Jesse Brown owed a duty of care to Young. R. 45, Pl.'s Resp. Memo. at 3–4.

In Illinois, the "determination of whether a duty exists—whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is an issue of law to be determined by the court." *Estate of Kundert v. Ill. Valley Cmty. Hosp.*, 964 N.E.2d 670, 672 (Ill. App. Ct. 2012). "[T]he existence of a legal duty is not to be bottomed on the factor of foreseeability alone," but on whether the harm reasonably was foreseeable. *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513

N.E.2d 387, 396 (Ill. 1987) (citing *Cunis v. Brennan*, 308 N.E.2d 617, 618 (Ill. 1974)). Although the reasonable foreseeability of injury is an important consideration in determining whether a duty exists, it is not the only consideration. "The question of duty in a negligence action should take into account the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant." *Id.*

### A.    Patient-Physician Relationship

Defendant argues that summary judgment is proper, as Plaintiff can prove no set of facts supporting the existence of a physician-patient or therapist-patient relationship between Young and Creedon or Young and Galban. Def.'s Memo. at 7. Defendant notes at the outset that the determination of whether a duty exists is an issue of law to be determined by the court. *Id.* at 8 (citing *Estate of Kundert v. Ill. Valley Cmty. Hosp.*, 964 N.E.2d 670, 672 (2012)). A direct physician-patient relationship, submits Defendant, requires a "consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Id.* at 9 (citing *Reynolds v. Decatur Mem'l Hosp.*, 660 N.E.2d 235, 240 (Ill. App. Ct. 1996)). Defendant contends that this relationship is absent here because Young called the VA to inquire about monetary benefits, not treatment. *Id.* Young, according to Defendant, informed Creedon that he did not want to come to the VA for treatment. As such, reasons Defendant, there was no express or implied consent to treatment, and hence, no duty to treat. *Id.* at 9–10 (citing *Hunter v. Amin*, 583 F.3d 486 (7th Cir. 2009)).

In addition, asserts Defendant, Jesse Brown did not provide Young any "mental health or developmental disabilities services," as those are defined in Illinois, since neither Creedon nor Galban provided any "examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare habilitation or rehabilitation" to Young. Def.'s Memo. at 10 (citing 740 ILCS 110/2). Therefore, concludes Defendant, Defendant owed no duty to Young.

Plaintiff counters that under Illinois law, a treatment relationship is established when an individual knowingly seeks the help of a physician or mental healthcare provider and when the provider knowingly accepts the individual for treatment. Pl.'s Resp. Memo. at 3 (citing *Mackey v. Sarroca*, 35 N.E.3d 631 (Ill. App. Ct. 2015)). Here, argues Plaintiff, the record establishes that Young contacted the OEF/OIF Clinic by telephone on July 9, 2015 to obtain help with his PTSD and drinking. Creedon answered the call and asked Young if he wanted his medical chart "pulled through" from the Hines VA to Jesse Brown. According to Plaintiff, Young agreed. *Id.* After the call, Creedon sent an email to her team, including Galban, asking that they pull Young into the Jesse Brown system. There is no evidence, asserts Plaintiff, that Creedon declined to accept Young into the OEF/OIF Clinic or that Young declined any treatment or services offered. *Id.* at 4.

Drawing all reasonable inferences in favor of the non-movant, argues Plaintiff, a question of fact exists as to whether Defendant owed Plaintiff a duty. Plaintiff's expert witnesses, notes Plaintiff, set out several factors which should have alerted a reasonably careful individual in Creedon's position that Young was at an increased

risk for suicide. After all, observes Plaintiff, Galban and Creedon are licensed social workers, not simply clerical staff answering and returning telephone calls. Pl.'s Resp. Memo. at 7–10.

At the outset, the Court notes that Plaintiff's contention that a treatment relationship is established when an individual seeks the help of a physician or *mental healthcare provider* and the provider knowingly accepts the individual for treatment, is unsupported by the authority Plaintiff cites. *See* Pl.'s Resp. Memo. at 3.[5] The only case cited by Plaintiff, *Mackey v. Sarroca*, 5 N.E.3d 631 (3d Dist. 2015), does not stand for that proposition. *Mackey* did not involve mental healthcare providers. Rather, *Mackey* was a medical malpractice case in which the issue before the appellate court was whether an on-call physician owed a duty of care to the patient for which the on-call physician was consulted by the attending physician. *Id.* at 633–34. Under the facts of that case, the *Mackey* court found a special relationship between the on-call physician and patient which gave rise to a duty of care. *Id.* at 634–35.

In Illinois, a physician's duty arises only when a physician-patient relationship has been expressly established or when a special relationship exists, such as when one physician is asked by another physician to provide a service to a patient, conduct laboratory tests, or review test results. *Siwa v. Koch*, 902 N.E.2d 1173, 1176 (Ill. App. Ct. 2009); *Weiss v. Rush North Shore Med. Ctr.*, 865 N.E.2d 555, 557 (Ill. App. Ct.

---

[5]Both Plaintiff and Defendant proceed under the presumption that the mental healthcare provider-patient relationship falls under the common-law defined physician-patient relationship. Yet, while Plaintiff suggests this implied relationship exists, neither party addresses whether this relationship in fact exists nor cites to any authority for it, and the Court need not address it.

2007). The physician-patient relationship is consensual; i.e., the patient seeks the physician's assistance, and the physician knowingly accepts the person as a patient. *Smith v. Pavlovich*, 914 N.E.2d 1258. 1266 (5th Dist. 2009); *Reynolds v. Decatur Mem'l Hosp.*, 660 N.E.2d 235, 240 (4th Dist. 1996) (holding that no doctor-patient relationship arose when physician gave informal opinion over the telephone to treating physician). Thus, a physician-patient relationship cannot be established when a patient does not seek that physician's medical advice and the physician does not knowingly accept that person as a patient. *Siwa,* 902 N.E.2d at 1176 (citing *Reynolds*).

It is undisputed that Young was never seen at Jesse Brown for treatment. The essence of Plaintiff's argument is that the telephone call that Young placed to Jesse Brown on July 9, 2015, coupled with Creedon's response to that call, establishes, at a minimum, a question of fact whether Young was seeking treatment for his PTSD and drinking, and therefore gave rise to a duty of care by Jesse Brown and its employees. The Court disagrees.

As a threshold matter, there is no evidence that Young sought the services of a physician. It is undisputed, as noted previously, that neither Creedon nor Galban are physicians. As noted by Plaintiff, they are clinical social workers. Pl.'s Resp. Memo. at 10. Plaintiff has not cited any authority for the proposition that a telephone call to a social worker gives rise to a recognized relationship and corresponding duty of care. Indeed, even in the physician-patient relationship context, courts have found that a telephone call does not give to such a duty.

In *Estate of Kundert*, 964 N.E.2d at 670, the appellate court held that no physician-patient relationship existed between a six-week-old newborn or his parents and the defendant hospital when the parents delayed seeking medical treatment for the newborn's illness based on medical advice received over the telephone. In the case, the mother called the hospital because her baby exhibited signs and symptoms of serious illness. The hospital operator transferred the call to an unknown individual in the emergency room, and the mother described her child's condition. The unknown individual told the mother that she was overreacting and directed her to give her child Tylenol and tepid baths. The individual also stated that the hospital did not have the equipment or medical personnel to provide medical services to infants. Relying on the medical advice that she received over the phone, the mother postponed treatment for the infant until the next day when she brought him to her pediatrician's office and then to the defendant hospital. There, the infant was diagnosed with bacterial meningitis and eventually died. *Id.* at 671–72. The plaintiffs filed suit against the hospital, alleging that the delay in treatment caused by the improper advice given by the defendant hospital's medical personnel over the telephone caused the infant's death. *Id.*

The trial court granted the hospital's motion to dismiss, finding that, as a matter of law, no relationship existed between the decedent and the defendant. *Estate of Kundert*, 964 N.E.2d at 672. The plaintiffs appealed, arguing that their complaint established a "direct connection" between the plaintiffs and the defendant because the mother sought medical advice from the hospital, the hospital's agent consented

to render medical care ("which equated to 'accept[ing] [the decedent] as a patient'"), and the mother relied on the advice. *Id.* at 672–74.

The appellate court affirmed the trial court's dismissal of the plaintiffs' complaint. The court found that the telephone contact did not create a physician-patient relationship sufficient to establish a legal duty because the allegations in the plaintiffs' complaint did not show that the defendant knowingly accepted the minor as a patient. *Estate of Kundert*, 964 N.E.2d at 676. The court rejected plaintiff's proposition that a physician-patient relationship is created any time an inquiry is made to a physician and the physician dispenses advice. The court also found compelling the fact that the hospital's agent specifically informed the decedent's mother that the hospital was not equipped to provide medical services to her infant to demonstrate that the hospital did not accept the newborn as a patient. *Id.*

Similarly, in *Reynolds*, 660 N.E.2d at 235, the patient sustained injuries and sought treatment in the emergency room. The emergency room physician sought a pediatric consult. The pediatricians examined the plaintiff and called another physician at home to discuss the case. This physician suggested running a test but had no further involvement with the patient's care. When the plaintiff sued this physician, the latter argued that there was no physician-patient relationship and that the court should grant him judgment as a matter of law. The trial court agreed entered summary judgment in favor of the physician. *Id.* at 236–38.

On appeal, the only issue before the appellate court was whether, as a matter of law, a telephone conference between two physicians created a physician-patient

17

relationship between a patient and a physician so as to create an enforceable duty in a medical malpractice action. *Reynolds*, 660 N.E.2d at 238. The court noted that determining whether a duty exists is an issue of law for the court to decide. *Id*. The court stated that a physician's duty is limited to those cases in which there is a direct physician-patient relationship or a special relationship, such as when an infant sues for prenatal injuries foreseeably caused by the physician's negligent care of the mother prior to conception, and that a consensual physician-patient relationship can exist when other persons contact the physician on behalf of the patient. *Id*. at 239. The court held that such a relationship did not occur in that case, since the physician merely answered an inquiry; a physician who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient. Consequently, the court affirmed the trial's granting of summary judgment in favor of the physician. *Id*. at 239–40.

In the absence of any authority under Illinois law, Plaintiff looks to an out-of-jurisdiction case for support, *Laskowski v. U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 307 (M.D. Pa. 2013), arguing that in that case, the court found that the VA could have foreseen and predicted a veteran suffering from PTSD who did not receive proper treatment was at risk for self-destructive behavior. Pl.'s Resp. Memo. at 11. Plaintiff's reliance on *Laskowski,* however, fares no better. In that case, the plaintiff-veteran actually received treatment from various healthcare providers at a VA hospital, visited the emergency room, was prescribed medication, and saw a psychiatrist who specifically diagnosed him with chronic PTSD. *Id*. at 309. In this

18

case, on the other hand, it is undisputed that Young never visited Jesse Brown for treatment.

Plaintiff has presented evidence that Young visited other VA facilities on three occasions only before the July 9, 2015 call. In April of 2008, Young obtained anger management counseling at the Hines VA. Pl.'s Resp. DSOF ¶ 3. In May of 2008, Young was seen for further evaluation by a mental health professional and was assessed to be a low risk for suicide. *Id.* Young then visited the emergency room of the Hines VA in July of 2014 for alcohol abuse treatment. *Id.* ¶¶ 4–5. Plaintiff has not presented evidence that Young ever visited another VA facility or even communicated with another VA facility until the July 9, 2015 call. Moreover, after the July 2014 visit to the Hines VA emergency room, Young received treatment at Holy Family and Lutheran General. *Id.* ¶¶ 9, 11. Plaintiff's suggestion that Plaintiff's July 9, 2015 call to a new VA facility was part of ongoing treatment based on treatment Young received from the VA based on his three prior visits to different facilities is too tangential to pass muster.

Moving on to Young's interaction with Jesse Brown and the OEF/OIF Clinic, other than the July 9, 2015 phone call and subsequent internal emails between Creedon and Galban, Plaintiff presents no other evidence showing that Young wanted to become a patient at Jesse Brown or the OEF/OIF Clinic, that Jesse Brown or the OEF/OIF Clinic agreed Young would be a patient of Jesse Brown or the OEF/OIF Clinic, or that any physician at Jesse Brown or the OEF/OIF Clinic knowingly accepted Young as a patient. *Siwa*, 902 N.E.2d at 1176; *Smith*, 914 N.E.2d at 1266.

The Court cannot ignore the fact that the OEF/OIF Clinic employs two primary care physicians, a psychiatrist, and two psychologists. Def.'s Resp. PSOF ¶ 6. Yet, the record does not show that Young saw or even spoke with any of them. Plaintiff also does not present evidence indicating that Creedon herself was a physician or medical professional, or was acting on behalf of a physician. Accordingly, Plaintiff's argument that Creedon's July 9, 2015 emails "set forth a series of facts establishing a treatment relationship" also must fail. Pl.'s Resp. Memo. at 3. As such, the Court cannot find the existence of a duty on behalf of Defendant to treat Young based on the lack of a physician-patient relationship.

To the extent there is some other legally-recognized duty that Defendant owed to Young regarding his treatment, Plaintiff does not articulate it. Plaintiff asks the Court to make a reasonable inference of a treatment relationship between Young and the VA based on the July 9, 2015 call and the subsequent email Creedon sent to Galban. Pl.'s Resp. Memo. at 5. Yet, Plaintiff cites to no legal authority for the Court to make such an inference, and the Court does not make such an inference. The only evidence Plaintiff has presented indicating any interaction between Young, on the one hand, and Jesse Brown or the OEF/OIF Clinic, on the other hand, is the approximately ten-minute call on July 9, 2015. Pl.'s Resp. DSOF ¶ 14. Defendant asserts that during the call, Creedon offered to enroll Young in one of several VA alcohol assistance programs and asked Young if he wanted to come into Jesse Brown for treatment, but that Young declined. DSOF ¶ 21. Plaintiff disputes this and counters that Young did not decline any treatment. Pl.'s Resp. DSOF ¶21. Yet,

summary judgment is not the place for a court to make "credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Payne v. Pauley*, 337 F.3d 767, 769 (7th Cir. 2003) (holding that "summary judgment cannot be used to resolve swearing contests between litigants"). Notwithstanding the foregoing, this factual dispute is not relevant for determining whether this call created a patient-physician relationship between Young and Jesse Brown or the OEF/OIF Clinic.

Plaintiff also suggests that a reasonable person should have appreciated Young's risk of suicide as a result of the July 9, 2015 call. Pl.'s Resp. Memo. at 7. However, Plaintiff does not explain how this creates a legally-recognized duty of care. Moreover, while Plaintiff suggests that Creedon should have known that Young was suicidal, the record does not support this. When Creedon spoke to Young, he sounded alert, oriented, and coherent, and he had normal cadence in his speech. Pl.'s Resp. DSOF ¶ 35. Dr. Levin, of Lutheran General, the last physician who treated Young before his death, noted that Young had denied any suicidal or homicidal ideations. *Id.* ¶ 12. At no time did Young express further suicidal thoughts after he left Lutheran General on July 3, 2015, and, if he did, his mother would have taken Young back to Lutheran General. *Id.* ¶ 52. Despite these arguments, again, this Court cannot conclude that Defendant owed a duty to Young to treat him.

### B. The Timing of the Return Call

In their briefing, Plaintiff and Defendant also address whether the VA, specifically Galban, had a duty to call Young back earlier than his attempt on July

24, 2015. Defendant argues that it was not foreseeable that the timing of a return call would cause someone to commit suicide, especially because the July 9, 2015 call primarily addressed Young's request for a service connection, i.e., benefits. Def.'s Memo. at 10–11. As a result, Defendant posits that the VA's duty of care did not extend beyond returning the call regarding the service connection, and that the duty did not include preventing Young's suicide. *Id.* at 11.

Plaintiff responds that Galban should have called Young earlier than July 24, 2015 and a more timely call would have prevented Young's suicide and death. Pl.'s Resp. Memo. at 3–7. The problem with Plaintiff's argument is that Plaintiff references no legal authority that establishes any duty relevant to when Galban should have called Young back. While Plaintiff and Defendant disagree regarding Galban's discretion in returning the call, as explained in more detail below, the Court cannot conclude that it was foreseeable that Young would commit suicide as a result of the VA's actions, or that the VA should have had such a burden placed upon it based on the undisputed factual information in the record regarding the July 9, 2015 call. *See Kirk*, 513 N.E.2d at 396.

In her initial email to her staff a few minutes after the call ended, Creedon assigned Galban as the case manager to outreach "once [Young] is in the system to assess for Care Management needs." DSOF ¶ 38; R. 42-10. In another email she sent to Galban that day, Creedon stated as follows: "I told him you would be reaching out to him to set up an appointment so he would know what you wanted him to bring with when you met (ie for SC). … I think this may be a guy who would be happy to

let us, let him, slip through the cracks, please don't let that happen. He needs help, thanks." Pl.'s Resp. DSOF ¶ 44; R. 42-10. Creedon used the phrase "slip through the cracks" because she had a gut feeling, and experiences with other veterans who had missed appointments or avoided phone calls from Veterans Affairs. She further stated that then people fault Veterans Affairs when they do not get care, and she wanted to be sure that Young really was "good to go," as he stated. Pl.'s Resp. DSOF ¶ 44.

During their meeting later that day, Galban clarified with Creedon whether Young had any immediate clinical needs or if the call was non-clinical. DSOF ¶ 46. Creedon confirmed with Galban that Young just wanted to help with service connection, that he did not want to come in for care, that he already had care established in the community, and that he was on the waiting list for outside alcohol treatment. *Id.* The timing for return calls by case managers such as Galban varies depending on many factors. Case managers are required to triage their cases by balancing the reasons for the call against whether the veteran is in crises, the degree of case required, and other veterans' needs. Whether the request is for service is clinical versus non-clinical is a primary factor to be considered. Pl.'s Resp. DSOF ¶ 48. Clinical requests, such as requests for mental health treatment, are more urgent and are given higher priority than non-clinical requests, such as service connection claims, or property taxes. *Id.* Plaintiff has not presented evidence that can cause the Court to conclude that Galban had a duty to call Young back earlier than his attempt on July 24, 2015. The record supports the conclusion that Galban's response time was

reasonable, and Plaintiff has not presented any legal authority calling for a different result. Accordingly, the Court finds that there was no such duty.

While the Court could end its analysis at this juncture, for the sake of completeness, the Court addresses Defendant's contention that it is entitled to summary judgment on the issue of proximate cause.

## II.     Proximate Cause

Defendant also moves for summary judgment on the issue of whether the VA's actions, specifically its breach of any duties it owed to Young, proximately caused Young's death. Def.'s Memo at 12–15. Plaintiff alleges that Young's death was a proximate result of Defendant's negligence. Compl. ¶ 15. Defendant posits that even if the VA owed a duty to Young to follow up with Young earlier than July 24, 2015, Plaintiff's wrongful death claim fails because the VA's response to the July 9, 2015 call was not the proximate cause of Young's suicide. Def.'s Memo. at 12. Plaintiff does not directly respond to Defendant's proximate cause argument. Instead, Plaintiff argues that the VA's actions were the proximate cause of Young's death due to the "loss of chance doctrine." Pl.'s Resp. Memo. at 12. According to Plaintiff, this doctrine applies so that Plaintiff "need only show that the alleged negligence increased a risk of harm or that the negligence deprived the plaintiff of the opportunity to undergo treatment that could have been more effective." *Id.*

Under Illinois law, the "term 'proximate cause' describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact,

caused the harm." *Dux v. United States*, 69 F. Supp. 3d 781, 786–87 (N.D. Ill. 2014) (*citing Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992)); *Jutzi–Johnson v. United States*, 263 F.3d 753, 755 (7th Cir. 2001). To prove proximate cause in a wrongful death action, a plaintiff must establish that the defendant's negligence was a cause in fact of death.

The Court finds that in viewing the facts in the light most favorable to the Plaintiff and drawing all inferences in the same light, there is no genuine dispute as to any material fact that the VA's actions were not the proximate cause of Young's death.

## A.    Cause in Fact

Defendant argues that neither the VA's actions in response to the July 9, 2015 call nor the timing of Galban's return call were the cause in fact of Young's death. Def.'s Memo. at 12. Defendant contends that no evidence suggests that Young committed suicide because the VA had not called him and such a suggestion is "sheer conjecture." *Id.* at 12–13. Even if Young had requested treatment from the VA, asserts Defendant, it was not reasonably foreseeable that Young would take his life because he did not receive a call back from the VA. *Id.* at 13. Plaintiff does not respond to Defendant's cause in fact argument.

"Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the plaintiff's injury." *Krywin v. Chi. Transit Auth.*, 938 N.E.2d 440, 446–47 (Ill. 2010) (citations omitted). Illinois courts generally employ either the "but for" test or the "substantial factor" test when evaluating cause in fact. *Turcios v. DeBruler*

*Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). A defendant's conduct under the "but for" test, "is not the cause of an event if the event would have occurred without it." *Id.* Under the "substantial factor" test, "the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Id.* Furthermore, a plaintiff must show that the decedent would not have committed suicide had the defendant's employees acted responsibly and that his suicide was "a foreseeable as well as actual consequence of the staff's negligence." *Jutzi-Johnson*, 263 F.3d at 755; *Belbachir v. United States*, 2012 WL 5471962, at *1 (N.D. Ill. Nov. 9, 2012).

The Court agrees with Defendant that the VA's actions were not the cause in fact of Young's death. The VA's actions do not meet the threshold for either the "but for" test nor the "substantial factor" test. *Turcio*, 32 N.E.3d at 1124. Plaintiff has not presented evidence that suggests that Young would not have committed suicide had the VA's employees called him after the July 9, 2015 call and before he died. Additionally, the VA's actions were not a material element or a substantial factor in bringing about Young's death. *Krywin*, 938 N.E.2d at 446–47. As indicated above, Plaintiff has not presented evidence establishing a physician-patient relationship between Young and Jesse Brown or the OEF/OIF Clinic. The undisputed facts show that Young left Lutheran General on July 3, 2015 AMA, and that Dr. Levin, the last physician who treated Young before his death, noted that Young had denied any suicidal or homicidal ideations. Pl.'s Resp. DSOF ¶ 12. At no time did Young express further suicidal thoughts after he left Lutheran General on July 3, 2015, and, if he

did, his mother would have taken Young back to Lutheran General. Pl.'s Resp. DSOF ¶ 52.

The Court similarly cannot conclude that there is a reasonable certainty that the VA's actions caused Young's death. Plaintiff has not presented any evidence that Young had suicidal thoughts after July 3, 2015. According to Young's mother, at or about the time of the July 9, 2015 call, she thought Young was deteriorating but she did not know he was suicidal and had no "inkling it was that bad." Pl.'s Resp. DSOF ¶ 52. Moreover, assuming, for the sake of argument, that the VA was negligent, the Court cannot see how Young's suicide was foreseeable, as explained in more detail below.

### B.    Legal Cause

Defendant argues that it is entitled to summary judgment because Young's suicide was not reasonably foreseeable as a likely consequence of the VA's actions, and that Young's suicide was an intervening cause of his death. Def.'s Memo. at 13–15. Again, Plaintiff does not address these arguments but instead asserts that the "loss of chance doctrine" should apply to this case, and, as Plaintiff suggests, therefore cause the Court to conclude that the VA's actions were the legal cause of Young's death. Pl.'s Resp. Memo. at 12.

"Legal cause is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct." *Dux*, 69 F. Supp. 3d at 787 (citing *Lee*, 605 N.E.2d at 503). Illinois courts have held that whether an injury is "reasonably foreseeable is

an objective test, not a subjective one." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1177 (Ill. 2018). "A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by an effective intervening cause." *Dux*, 69 F. Supp. 3d. at 787 (quoting *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 910 (Ill. App. Ct. 2007)).

Further, Illinois courts traditionally have found suicide "to be an unforeseeable act that breaks the chain of causation required by proximate cause." *Johnson v. Wal– Mart Stores, Inc.*, 588 F.3d 439, 442 (7th Cir. 2009) (citing *Luss v. Village of Forest Park*, 878 N.E.2d 1193, 1206 (Ill. App. Ct. 2007)). "It is well established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee." *Johnson*, 588 F.3d at 442 (citing *Crumpton*, 871 N.E.2d at 910). A plaintiff bears a heavy burden of pleading and proving facts that would overcome application of this rule. *Turcios*, 32 N.E.3d at 1124.

Illinois courts recognize "two—and only two—exceptions to the general rule articulated and applied by the *Crumpton* court. The first of these two exceptions 'deems suicide foreseeable when the defendant's conduct caused an injury, most often to the head, that made the decedent 'so bereft of reason' as to cause him to attempt suicide.'" *Johnson*, 588 F.3d at 442; *Dux*, 69 F. Supp. 3d at 787. The second exception is where a hospital fails to maintain a careful watch over a patient it knows to be suicidal. "This is an action asserting psychiatric malpractice and the failure to properly supervise" where "the negligence is in the failure to carefully protect a

28

patient from inflicting self-harm." *Dux*, 69 F. Supp. 3d at 788 (citing *Winger v. Franciscan Med. Ctr.*, 701 N.E.2d 813, 818 (Ill. App. Ct. 1998)).

*Dux* provides a helpful illustration of the interplay between proximate cause and suicide. In *Dux*, doctors diagnosed a patient with prostate cancer, and he underwent a radical prostatectomy, which resulted in, among other things, depression. 69 F. Supp. 3d at 783. After his surgery, the doctors told him that that they had mistakenly switched the tissue from his biopsy with that of another patient, and that his biopsy was in fact negative. His depression continued and he ultimately committed suicide. *Id.* The patient's daughter filed suit on behalf of the patient's estate against the United States, and one of the counts in the suit was for wrongful death. *Id.* at 784. Both parties moved for partial summary judgment on the issue of whether the government's breach proximately caused the patient's death, and the court granted the government's motion. *Id.*

The court noted the general rule in Illinois that a negligent actor cannot be liable for a victim's decision to kill himself. 69 F. Supp. 3d at 789. The court stated that the wrongful death claim would only survive if the one of the two exceptions to the general rule applied. The court found that neither exception applied. First, it found that the was no evidence that the patient was "insane and bereft of reason" after undergoing the prostatectomy. Rather, the evidence showed that he knew right from wrong after his surgery and that there was no evidence that he was incompetent in the days and weeks leading up to his death. Second, the court found that the

"psychiatric malpractice" exception did not apply to the case because the alleged negligence was in the diagnosis or treatment. *Id.*

Turning to this case, to survive summary judgment then, Plaintiff's claim must fall under one of the above cited exceptions. Plaintiff fails to address either exception in her response brief. Pl.'s Resp. Memo. Plaintiff has not presented evidence indicating that the VA, Jesse Brown, the OEF/OIF Clinic, Creedon, or Galban caused an injury to Young that made him so bereft of reason as to cause him to attempt suicide so the first exception does not apply. *Johnson*, 588 F.3d at 442; *Dux*, 69 F. Supp. 3d at 787. Nor does Plaintiff present any evidence suggesting that Young was receiving psychiatric care from or was a psychiatric patient of Jesse Brown or the OEF/OIF Clinic. Therefore, the second exception cannot apply. *Johnson*, 588 F.3d at 442; *Dux*, 69 F. Supp. 3d at 787. On this basis alone, the VA's actions cannot be the proximate cause of Young's death as a matter of law.

Instead Plaintiff contends that the VA's actions were the proximate cause of Young's death by relying on the "loss of chance doctrine." Plaintiff argues that this doctrine applies so that Plaintiff "need only show that the alleged negligence increased a risk of harm or that the negligence deprived the plaintiff of the opportunity to undergo treatment that could have been more effective." Pl.'s Resp. Memo. at 12 (citing *Hemminger v. LeMay*, 11 N.E.3d 825 (Ill. App. Ct. 2014)). Plaintiff maintains that she has met this burden through the testimony of her expert witnesses who have opined that if Galban had called Young back sooner, as required by the standard of care, the risk of suicide would have been greatly reduced. *Id.*

Defendant retorts that the loss chance doctrine does not apply to this case and that such a doctrine does not relax a plaintiff's burden of proving causation. R. 47, Def.'s Reply at 14–15. The Court agrees.

As an initial matter, Plaintiff cites to no legal authority for the application of the "loss of chance doctrine" to this case. The "lost chance" or "loss of chance" doctrine is an Illinois common law doctrine in medical malpractice actions that refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff. *Holton v. Mem'l Hosp.*, 679 N.E.2d 1202, 1209 (Ill App. Ct. 1997). Yet, this immediate suit is not a medical malpractice action, and this doctrine does not apply. Moreover, Plaintiff cannot show why this doctrine would overcome the Illinois black letter suicide rule.

The only cases Plaintiff cites, *Reardon v. Bonutti Orthopeadic Servs., Ltd.*, 737 N.E.2d 309 (Ill. App. Ct. 2000), and *Hemminger v. LeMay*, 11 N.E.3d 825 (Ill. App. Ct. 2014), are inapplicable as neither case involves a suicide. In *Reardon*, the plaintiff had to undergo a foot amputation following the development of compartment syndrome. 737 N.E.2d at 314–15. Plaintiff brought a medical malpractice action against his physician who failed to see him after plaintiff developed symptoms consistent with compartment syndrome. *Id.* at 310. The appellate court reversed the jury verdict in favor of the defendant, finding that plaintiff had presented evidence that the chances of saving his foot would have been greater had the defendant

31

personally examined plaintiff. *Id.* at 319. In *Hemminger*, the decedent died of cervical cancer and the plaintiff, the decedent's husband, brought a medical malpractice action against a gynecologist and medical clinic. 11 N.E.3d at 826. The appellate court reversed the trial court's entry of a directed verdict in favor of the defendants, finding that plaintiff had presented sufficient evidence to create a jury question on the issue of proximate cause under a "lost chance of survival theory." *Id.* at 836–37. In neither case was the issue before the court whether the defendant's conduct was a proximate cause of the decedent's suicide.

In short, even assuming that Defendant owed Young a duty that it breached, such a breach did not proximately cause Young's death by suicide.

## Conclusion

For the reasons given above, Defendant's Motion for Summary Judgment [40] is granted.


DATED: December 1, 2020

United States District Judge
Franklin U. Valderrama